**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 14-24054-CIV-LENARD/GOODMAN**

SANTOS MANUEL PANCHAME
MARTINEZ,

      Plaintiff,

v.

EDDY COTO PRODUCE, INC., et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS CONCERNING**
**MOTION TO ENFORCE  FLSA SETTLEMENT**

United States District Judge Joan A. Lenard referred to the Undersigned Plaintiff's Motion to Enforce Settlement Agreement. [ECF Nos. 101; 108]. The motion is fully briefed, and the Undersigned held an evidentiary hearing on July 19, 2017. [ECF No. 116]. The evidentiary hearing also included oral argument on the motion.

For reasons outlined in greater detail below, the Undersigned respectfully recommends that Judge Lenard **grant** the motion but reject the motion's request to enforce a provision which I have determined to be an unenforceable penalty.

**Factual and Procedural History**

The parties to this Fair Labor Standards Act ("FLSA") case entered into a settlement agreement which was fully executed on May 27, 2016. [ECF No. 107-1]. The 18-page settlement agreement was drafted by counsel for Defendants, Eddy Coto

Produce, Inc. (the "Company") and Edvardo Coto (one of the Company's principals). For purposes of the motion to enforce the settlement agreement, pages six through eight are particularly applicable.

In numbered paragraph four of the settlement agreement, the parties agreed that Plaintiff "must provide a tax identification number ('TIN')"[1] to the Defendant Employer so that that employer "may make the appropriate payroll deductions from the back wage portion of the settlement amount and issue a W-2 and 1099 to him at the end of the current tax year." [ECF No. 107-1, ¶ 4].  That paragraph also provided that Plaintiff "shall immediately apply for a TIN number upon his execution of the Agreement and provide proof of his TIN number or of the denial of his application for a TIN, should that occur." [ECF No. 107-1, ¶ 4].

Paragraph five of the settlement agreement provides for certain payments from the Company to the Plaintiff following "his providing proof to Company of a valid TIN number, his submission of a W-4 and W-9 and his attorneys' submission of a W-9 to the Company[.]" [ECF No. 107-1, ¶ 5]. If those conditions occurred, then the settlement agreement requires Defendants to pay "$30,000, less applicable wage deductions." [ECF No. 107-1, ¶ 5].

---

[1]     The TIN is also referred to as ITIN.

The settlement agreement apportioned this $30,000 payment to Plaintiff as follows: (1) $10,000 "as back wages, less applicable required deductions;" (2) $10,000 as "liquidated damages;" and (3) $10,000 "as consideration for the General Release and other promises made in the agreement." [ECF No. 107-1, ¶ 5].

The settlement agreement also provided for the payment of an additional $30,000 "as [Plaintiff's] attorney's fees and costs." [ECF No. 107-1, ¶ 5].

The settlement agreement required the Company to deposit $60,000, which was designated as the "escrow deposit," into a "discrete bank account located [at] Bank United in the name of Eddy Coto Produce, Inc., [by] no later than 5/26/2016." [ECF No. 107-1, ¶ 5]. The settlement agreement also provided for the parties to "jointly move for an interim order requiring [the defendant] COMPANY to maintain the entire escrow deposit in the <u>Bank United</u> account without alteration, diminishment or movement of any portion of the Escrow Deposit on penalty of contempt, absent further Court order from this Court." [ECF No. 107-1, ¶ 5].

The settlement agreement also provided as follows, on page eight:

**Following the Court's approval of this Agreement** and entry of an order permitting distribution of Escrow Deposit as specified by the Court, the total amount of the settlement (as may be determined and/or re-apportioned by the Court in its fairness review) shall be payable to EMPLOYEE and his attorneys **within five (5) calendar days of the date that has tendered proof of his valid TIN and has provided his executed W-4 and 1099 and his attorney's executed W-9 to COMPANY.** COMPANY shall not be obligated to pay EMPLOYEE or his attorneys any

3

portion of the settlement unless and until EMPLOYEE and his attorneys fully have complied with the Conditions Precedent. In the event that EMPLOYEE is denied a TIN and provides proof that he cannot obtain a TIN number under any circumstances, the parties agree to jointly move the Court to reconsider its order approving this Agreement so that the parties may explore alternative options for lawful payment of the settlement.

[ECF No. 107-1, ¶ 5 (emphasis supplied)].

The settlement agreement also contained a penalty provision, also on page eight: "COMPANY's failure to pay the settlement **within five (5) days of EMPLOYEE and his attorneys' satisfaction of the conditions precedent** for payment shall be deemed a breach of this Agreement and shall result in the payment of an additional ten thousand dollars and no cents ($10,000) **as a penalty**." Following this provision, in the same paragraph, the settlement agreement further states that "all checks shall be delivered to employee's counsel." [ECF No. 107-1, ¶ 5 (emphasis added)].

The penalty provision does not include any language requiring Plaintiff to advise Defendants of a breach, nor does it provide for a cure period. It simply purports to impose the $10,000 as a penalty upon "failure to pay the settlement within five (5) days of the conditions precedent having been satisfied." [ECF No. 107-1, ¶ 5].

Paragraph 7.A(2) requires confidentiality and provides that the Company is entitled to injunctive relief and an award of actual damages or $1,000, whichever is greater, if the Company demonstrates that Plaintiff or anyone to whom he has disclosed

4

Confidential Information breached any of the provisions in paragraph seven (concerning confidentiality). [ECF No. 107-1, ¶ 7].

The settlement agreement also says, in numbered paragraph eight, that "this agreement was explained and translated to Defendants by [defense counsel] before its execution by Company." [ECF No. 107-1, ¶ 8].

Paragraph 13 of the settlement agreement provides that the laws of the State of Florida shall govern the interpretation and enforcement of the agreement. [ECF No. 107-1, ¶ 13].

Paragraph 15 of the settlement agreement provides as follows: "In the event that one or more terms or provisions of this Agreement are found to be invalid or unenforceable for any reason or to any extent, each remaining terms and provisions [sic] shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law and the Court shall have the authority to reform the Agreement as necessary to make the remaining provisions valid." [ECF No. 107-1, ¶ 15].

Paragraph 16 of the settlement agreement contains an additional attorney's fees provision: "Any breach of any term, provision, or obligation of this Settlement Agreement by any party, shall entitle the non-breaching party(s) to seek enforcement of such term, provision or obligation, and shall entitle the prevailing party to an award of the reasonable attorney's fees and costs." [ECF No. 107-1, ¶ 16].

On May 31, 2016, the parties filed a joint motion for fairness review and to dismiss with prejudice the lawsuit. [ECF No. 81]. The motion discussed why the settlement agreement was fair to the plaintiff, but did not discuss why it was also fair to Defendants. However, the motion noted that the settlement agreement gave Defendants the right to contest the reasonableness of the amount of fees and costs claimed by the Plaintiff. Judge Lenard referred the joint motion to me. [ECF No. 82]. At the Undersigned's direction, Plaintiff filed a copy of the retainer agreement and his attorneys' billing and costs records. [ECF No. 86].

The Undersigned required [ECF No. 89] Defendants to file their own counsel's billing records if they planned to challenge the reasonableness of Plaintiff's counsel's fees, and so Defendants filed their attorneys' redacted billing records [ECF No. 91]. The Court held a telephonic fairness hearing [ECF No. 92] on July 6, 2016 and issued a Report and Recommendations on July 8, 2016 [ECF No. 93]. In that Report, I noted that Defendants put $30,000 in escrow to cover the fees and costs requested by Plaintiff: $27,711.50 in fees and $2,288.50 in costs. I recommended that plaintiff's counsel's fee award should be reduced to $24,000 and that they should be awarded $2,288.50 in costs, for a total award of $26,288.50. [ECF No. 93]. The July 8, 2016 Report also recommended that the balance of $3,711.50 be returned to Defendants.

Both sides filed objections [ECF Nos. 94, 95] to the Report, and Plaintiff filed a response [ECF No. 96].

In an October 18, 2016 Order, Judge Lenard modified the Report and adopted the modified version. [ECF No. 97]. Specifically, the District Court determined that Plaintiff should recover $24,000 in attorney's fees but only $1,702.70 in costs, with the remaining $1,297.30 to be returned to Defendants.

Plaintiff filed his motion to enforce settlement agreement [ECF No. 101], Defendants responded [ECF No. 103], and Plaintiff filed a reply [ECF No. 105].

In the motion to enforce, Plaintiff explained that only the $10,000 of the settlement allocated to back wages was subject to withholding and required deductions. [ECF No. 101, p. 2]. The motion further explained that Defendants made partial payment of the settlement on October 21, 2016 but did not pay the back wages. [ECF No. 101, p. 2]. Plaintiff's motion represents that his counsel "sent Defendants several Notices of Breach and follow up communications as required by the Agreement." [ECF No. 101, p. 3]. As noted, however, the settlement agreement does not require notice of breach, nor does it contain a cure period. In any event, the parties' attorneys communicated about the non-payment of the back wages portion of the settlement.

The motion contends that Defendants furnished a purported W2 check of only $1,000 on October 27, 2016, explaining that $9,000 was "deducted [by Defendants] as

back wages on the *entire* amount Plaintiff received as his settlement portion." [ECF No. 101, p. 3 (emphasis added)]. The motion is phrased awkwardly, as Plaintiff actually means that $9,000 was being withheld or deducted **from** the $10,000 back wages for taxes and other withholdings on the <u>entire</u> $30,000 (and not that it was being deducted "**as** back wages").

The motion asks for a judgment against Defendants for $21,080.00, which consists of the $10,000 "breach penalty," the "outstanding breach amount of $9,000 less applicable deductions," and $2,080 for "reasonable attorneys' fees accrued as of the filing of the instant Motion." [ECF No. 101, p. 5]. It also asks for additional fees against Defendants. [ECF No. 101, p. 5].

Defendants' response explained that their tax preparer advised them that "she could not use the Plaintiff's TIN to make federal wage deductions and that a social security number would be necessary to comply with the back wage provision in the Settlement Agreement." [ECF No. 103, p. 2]. The response further noted that Plaintiff's counsel had been advised in an email "that an issue had arisen regarding taxation of the settlement sum but that checks for the liquidated damages and Plaintiff's attorney's fees and costs would be couriered to its offices that day" and that the checks "were delivered that same day and received by Plaintiff's counsel." [ECF No. 103, p. 2]. The

response does not specify *which* date was "the same day," however. The email attached to the response shows that the day was Friday, October 21, 2016. [ECF No. 103-1].

According to Defendants' response, Plaintiff's counsel "observes the Jewish Sabbath and its office was closed on Saturday." [ECF No. 103, p. 2]. It then explained that Plaintiff's counsel sent a notice of default on Sunday, October 23, 2016, "based on the missing back wage check." [ECF No. 103, p. 2]. The response further notes that "Plaintiff's counsel's office was closed on Monday, October 24th, and Tuesday, October 25th for the Jewish holidays of Simchat Torah and Sh'mini Atzerit and Defendants' counsel could not contact **any** attorney in the office to discuss the possible unenforceability of the 'back wage' provision (nor otherwise deliver the remaining check had it been prepared)." [ECF No. 103, pp. 2-3].

The response, which was verified by defense counsel, also noted that defense counsel "does not provide tax advice and relies upon tax professionals for expertise." [ECF No. 103, p. 3]. Defense counsel explained that she "believed it best to obtain a 'second opinion' on the issue to 'be certain'" that the Defendants' tax preparer was correct in her interpretation that the "'back wage' provision of the settlement agreement was unenforceable." [ECF No. 103, p. 3].

The response explained that defense counsel consulted with "**two separate Certified Public Accountants**" about the tax preparer's opinion and was told by both

accountants "that *any* payments to an illegal alien like Plaintiff were subject to the IRS's requirement for 30% withholding." [ECF No. 103, p. 3 (emphasis added)]. The response also advised that "one accountant suggested that the only way he knew to satisfy the terms of the settlement agreement was to categorize the final payment as 'other income' and provide Plaintiff with a 1099 at the end of the tax year." [ECF No. 103, p. 3]. Defense counsel's verified response then explained that this information provided by the CPAs (who were not identified by name) was shared with Defendants' tax preparer, "who then agreed to prepare the final check due under the settlement agreement and withhold 30% of the moneys paid to Plaintiff as stated in IRS Publication 515." [ECF No. 103, p. 3].

According to the response, a check was then immediately prepared, along with a statement explaining the 30% deduction, and hand-delivered to Plaintiff's counsel's office on October 27, 2016.   [ECF No. 103, pp. 3-4].

The exhibits attached to the response reveal an email exchange between counsel on October 27, 2016. [ECF 103-1]. The first email is from a defense firm paralegal, sent at 11:29 a.m. [ECF No. 103-1, p. 3]. It does not expressly show to whom it was sent, but circumstances suggest it was sent to one of Plaintiff's attorneys. This email explained that a courier had picked up the "pending settlement check" from defense counsel's

office and that it was expected to be delivered later in the day. [ECF No. 103-1, p. 3].

The email did not contain an explanation about the amount of the check, however.

Later that afternoon, at 3:33 p.m., one of Plaintiff's attorneys sent an email to

defense counsel. [ECF No. 103-1, p. 3]. She wrote:

> We just received a check for the amount of $1000 without any receipt showing how much was deducted and for what specifically the deductions were made. The outstanding breached amount was for $10K and clearly the check we received was not for that amount. We believe the check dropped off was sent as a transparent attempt by Defendants to avoid breach. We intend to move to enforce the Agreement and for all remedies set forth in the Agreement with regards to the breach.

 [ECF No. 103-1, p. 3].

Five minutes later, Plaintiff's counsel sent another email.  This time, the message

was somewhat more specific:

> The Agreement specifically states that only the one check for $10K is subject to withholdings NOT the entire $30K. Please let me know by no later than 5:00 p.m. today is Defendants plan [sic] on dropping us a check for the outstanding monies by tomorrow. Absent a response in the affirmative we will proceed accordingly.

[ECF No. 103-1, pp. 2-3].

> Approximately half an hour later, defense counsel sent a responsive email: Please go to the IRS website where it discusses payments to illegal aliens. The IRS requires 30% withholding of all amounts paid to the worker. This explains why the last check is for $1000.00 since $9000 equals 30% of $30,000.00. The hold up in getting you the last checks [sic] was because of this very issue as we wanted to be sure of the interpretation.  It is not just the "wage portion" that is subject to the deduction, which is why we had

to consult a CPA to figure this out. If you have authority that states otherwise, please let me know immediately.

[ECF No. 103-1, p. 2].

Plaintiff's counsel did not provide any contrary authority, and the motion to enforce settlement was filed.

Defendants state in their response to the motion that three tax professionals provided advice that "the back wage portion of the settlement agreement was unenforceable as written due to Plaintiff's illegal status" and that they were "forced to comply with the settlement agreement in the only manner they understood was allowed by law: taking the 30% deduction of all amounts paid to Plaintiff from the back wage portion of the settlement." [ECF No. 103, p. 4].

Defendants' response asserted the following legal arguments: (1) parties cannot contract to violate the law; (2) an illegal contract provision or one contrary to public policy will, if possible, be severed from the remainder of the contract; (3) "neither side realized when the settlement agreement was drafted that normal federal deductions could not be made from the 'back wage' portion and deposited with the government using a TIN number or that the IRS required that 30% of _all_ sums paid to illegal aliens be withheld;" and (4) paying the settlement sum any differently than defense counsel outlined (i.e., withholding 30% from the entire settlement amount, not merely from the

12

$10,000 in back wages) would "violate the IRS code and result in an illegal agreement." [ECF No. 103, pp. 5-7 (emphasis in original)].

The response condemns Plaintiff's motion as seeking both illegal and inequitable relief. It emphasized that although Plaintiff's counsel's office was not open for business on October 22nd through 25th of 2016, Plaintiff still seeks to hold them to a "five (5) day cure provision and tax them a $10,000.00 penalty for their 'breach' of an unenforceable provision in the settlement agreement, plus additional attorney's fees and costs." [ECF No. 103, p. 5]. In addition, the response describes the scenario as inequitable because "Plaintiff's counsel never provided defense counsel with authority" that suggests that "Defendants' interpretation of the IRS Code is mistaken." [ECF No. 103, p. 6].

The response contends that Defendants acted reasonably and promptly and argues that they should "not be penalized for a delay caused by impossibility of performance." [ECF No. 103, p. 6].

The response does not further discuss the notion of impossibility of performance. And it did not raise the argument that the $10,000 payment for a breach was an unenforceable penalty. It did not assert that Defendants entered into the settlement agreement under duress. Finally, other than briefly noting that neither party "realized" that the payment called for in the settlement agreement could not be made legally, the

response does not otherwise discuss the mutual-mistake doctrine (and never invokes that specific phrase, either).

Defendants also requested in their response that the Court "reform" the settlement agreement to "provide that all payments made to Plaintiff are subject to a 30% deduction for federally required withholding in accordance with IRS Publication 515 (2016)." [ECF No. 103, p. 6]. The response does not discuss the standards for contract reformation. Defendants did file a copy of IRS Publication 515, entitled "Withholding of Tax on Nonresident Aliens and Foreign Entities." [ECF No. 104-1].

In his reply, Plaintiff argues that he should not be considered a "non-resident" and/or a "foreign entity" because he meets the "substantial presence test." [ECF No. 105, p. 2]. Therefore, he says, the entire amount of the settlement funds is not subject to 30% withholding. Instead, he argues that he should be subject to withholdings as a resident alien, which means withholding is necessary only for the back wages portion of the settlement. In addition, he argues that the entire amount of the settlement funds is not subject to 30% withholdings even if the Court considered him a non-resident or foreign entity because the portion of the settlement not deemed back wages is not considered "income from performing independent personal services." [ECF No. 105, p. 3].

14

Plaintiff also argues that Defendants had almost three months to consult with an accountant about the payment of the settlement funds and any tax ramifications arising from payment made in accordance with the settlement agreement. Plaintiff points out that (1) the settlement agreement was fully executed by May 27, 2016; (2) his counsel sent the necessary conditions precedent documents to defense counsel on August 22, 2016; (3) his notice of breach was sent on October 19, 2016; and (4) Defendants had almost five months to consult with an accountant. [ECF No. 105, p. 3]. In his reply, Plaintiff requests $4,342 as additional fees. [ECF No. 105, p. 5].

On July 12, 2017, one week before the scheduled omnibus hearing, Defendants filed their notice of intent to rely on additional arguments -- that paragraph 5 of the settlement agreement is unenforceable under Florida law and should be severed under the severability provision of paragraph 15. [ECF No. 111]. This July 12, 2017 notice was the first time that Defendants formally announced their view that this paragraph of the settlement agreement (drafted by their attorney) is unenforceable.

On July 18, 2017, the day before the evidentiary hearing, Defendants filed their "Stipulation as to Taxation of Back Wage Portion of Settlement." [ECF No. 117]. In this filing, Defendants explained that their attorney, in preparation for the hearing, had consulted with Frank Beck, the CPA she intended to use the next day as an expert witness. [ECF No. 117, p. 2]. Mr. Beck is not the tax preparer who refused to issue the

check the year earlier and he is not one of the two CPAs who defense counsel consulted with in 2016.

According to this proffered stipulation, Defendants advised that Mr. Beck's opinion is that the 30% need not be withheld if Plaintiff met the substantial presence test during this tax year (i.e., 2017) and also met the other requirements for substantial presence. [ECF No. 117, p. 2]. Therefore, Defendants' submission explained, "Plaintiff then could be treated as a resident alien (despite his alien status) and normal payroll deductions could be taken from the back wage portion." [ECF No. 117, p. 2].

However, the self-described stipulation also explained that Mr. Beck confirmed "that Defendants' tax advisor was correct: the W-2 form expressly states that it cannot be used to report wages for an illegal alien, regardless of residence status, and Plaintiff is required to obtain a social security number." [ECF No. 117, p. 2].

All parties conceded that Plaintiff does not have a social security number.  That is why he obtained the TIN. According to a footnote in Defendants' submission, "the instructions for completing a W-2 Form "state that an ITIN number cannot be accepted in place of a social security number." [ECF No. 117, p. 2 n. 1].

Defendants offered the following stipulation: "if  Plaintiff  will  tender  to Defendants a declaration under penalty of perjury certifying that he meets all of the Tax Code requirements to be considered a resident alien, including that he has met the

16

'substantial presence' test _for this tax year_, they are prepared to issue a payroll check, less deductions, for the remaining back wages due to him under the settlement agreement and report it under a social security number. (Plaintiff already was paid $1000.00 of the $10,000.00 back wage portion so the net wages from $10,000.00 would be reduced further by $1000.00)." [ECF No. 117, p. 3 (emphasis in original)].

## The July 19, 2017 Hearing

During the non-evidentiary, argument portion of the hearing, defense counsel argued that her clients were "forced" to enter into the settlement agreement because it would have been significantly more expensive to defend the case through trial. She also argued that the so-called penalty provision (imposing the obligation to pay $10,000 in case of a breach) was also entered into under duress.

Defendants had not filed a motion to set aside the settlement agreement under a duress theory and had not mentioned a duress argument concerning the May 2016 settlement agreement until the July 2017 hearing.

Defense counsel also argued that the $10,000 breach provision is an unenforceable penalty, an argument raised for the first time a week earlier. She also contended that the mutual-mistake doctrine applied, excusing her clients' failure to timely comply with the payment obligation for the settlement's back wages portion.

Plaintiff's counsel argued that his client met the substantial presence test, while Defendants, who took Plaintiff's deposition here in Miami earlier in the case, conceded that they did not have any evidence to establish that Plaintiff was no longer in the country. Basically, their position was that they simply did not know where Plaintiff resides and could not say with certainty whether he met the substantial presence test.

Both sides presented an expert witness.

Plaintiff relied upon Daniel Ben Hayoun, a Venezuelan attorney who also earned a J.D. in the United States and who has an LLM in tax planning. He explained that Plaintiff's counsel contacted him several months earlier to discuss the $10,000 in back wages owed to Plaintiff under the settlement agreement.

According to his expert opinion testimony, his recommendation is that the employer send a letter to the IRS, along with a check for the withholding (but only from the $10,000 portion), explaining that there is no social security number being provided on the W-2 form because Plaintiff does not have one, and further explaining that Plaintiff is a resident alien who has an ITIN number. Assuming that Plaintiff did not earn other income besides the income he earned from Defendants, then Mr. Ben Hayoun predicted that the amount withheld from the remaining $9,000 owed on the back wages would be between $1,000 and $1,500. He predicted that the IRS would accept the money tendered, along with the W-2 form and the letter.

18

Significantly, Mr. Ben Hayoun testified that there are no circumstances justifying the withholding of $9,000 from the $10,000 back wages settlement amount owed by Defendants to Plaintiff. He has not previously provided testimony as an expert witness.

Defendants relied upon Mr. Beck, a CPA who had been contacted by defense counsel for this case only a few days earlier. Thus, he was not, and could not have been, one of the CPAs defense counsel relied upon last year. The identities of those two CPAs have not been provided to this Court. Mr. Beck has provided expert opinion testimony before.[2]

Mr. Beck's opinion was based on the assumption that Plaintiff is a resident alien for tax purposes -- i.e., he meets the substantial presence test. Mr. Beck explained that the amount of taxes owed would not change depending on whether Plaintiff is here legally or illegally. Mr. Beck said he has never been in a situation (like here) where the plaintiff to be paid is an illegal alien but meets the substantial presence test.

Mr. Beck opined that the advice from Defendants' tax preparer was not wrong because the W-2 form does require a social security number, which Plaintiff lacks.

_____

[2]     The Order scheduling the hearing provided that "the accountants and financial professionals who the parties rely upon for their opinions concerning the tax withholdings shall testify." [ECF No. 109]. Because Defendants had not relied upon Mr. Beck in 2016 (because he had not even been contacted until two days before the July 19, 2017 hearing), Plaintiff urged me to exclude him from testifying.  I rejected the request. But I certainly recognize that Defendants did not, as required, bring to the hearing the two CPAs on which their counsel relied in 2016.

19

However, Mr. Beck also opined that Defendants could have followed the protocol suggested by Plaintiff's expert (i.e., sending a letter, explaining the circumstances surrounding the absence of a social security number to the IRS, along with the requisite check for the withholdings). He further opined that it would be prudent for Defendants to obtain a declaration from Plaintiff, confirming the facts to establish that he met the substantial presence test. He also opined that a court order accompanying the letter would be more likely to yield a positive response from the IRS.

In Mr. Beck's opinion, the parties had a mutual mistake about how the back wages portion of the settlement should be paid (and, therefore, how the withholdings should have been taken, and what forms should have been filled out).

On cross-examination, Mr. Beck conceded that he does not know what the Company's counsel did to comply with the $10,000 back wages settlement payment obligation before defense counsel contacted him a few days before the hearing. However, he explained that defense counsel advised him that she consulted with other CPAs who advised that 30% from the entire settlement amount should have been withheld.

In addition, Mr. Beck acknowledged on cross-examination that it was a mistake (by Defendants) to have withheld $9,000 from the final payment.  He explained that the mistake was treating Plaintiff as a non-resident alien, which incorrectly caused the

withholding to be 30% of the entire gross amount of the settlement. Plaintiff's satisfaction of the substantial presence test means that this across-the-board 30% withholding was not necessary.

Mr. Beck testified that he did not know if Defendants had asked about the substantial presence test before Monday, July 17, 2017, which was two days before the hearing. He also conceded that the Company had not attempted to explain to the IRS why it was submitting a W-2 form and withholding check without a social security number. On the other hand, he explained that the 30% withholding would not have been a mistake if Plaintiff was not a "U.S. person," as defined by the substantial presence test. Thus, the $9,000 withholding processed in October 2016 would not have been a mistake if Defendants did not then know that Plaintiff met the substantial presence test (but did know that he is an unlawful alien).

On additional cross-examination, Mr. Beck said that he did not know of any evidence that Defendants had in fact paid any withholding to the IRS even if it turned out that $9,000 was the correct amount to withhold.[3]

Although they were not placed under oath, counsel for both sides provided explanations about the facts surrounding Defendants' mutual-mistake theory.

---

[3]     Defense counsel advised the Court that the $9,000 withheld in October 2016 is being kept in a bank account.

Plaintiff's counsel explained that the attorneys *did* discuss the tax issue because it was the Company's defense counsel who insisted that Plaintiff obtain an ITIN number to withhold the appropriate amount for the $10,000 attributable to the back wages portion of the settlement agreement. Based on this discussion, which led to the insertion of certain provisions in the settlement agreement, Plaintiff followed through and obtained an ITIN number.

But defense counsel argued that there was a mutual mistake because both sides mistakenly believed that a W-2 form could be submitted with the withholding with an ITIN number -- and that neither side understood at the time that a social security number was actually required.

Counsel then took contrary positions on whether paragraph 5 (the $10,000 payment for a breach provision) is enforceable.

## Applicable Legal Principles and Analysis

### Duress

Defendants did not present any **evidence** concerning the argument, asserted for the first time at the hearing that they entered into the settlement agreement and agreed to the penalty provision it contained under duress. The Undersigned therefore recommends denial on this ground alone. Defense counsel's conclusory rhetoric is insufficient to adequately present a duress defense.

Setting aside the absence of actual evidence, the theory itself -- that Defendants were "forced" to enter into the settlement agreement because it would have been far more costly to litigate the case -- is inadequate. Moreover, Defendants have not moved to rescind the agreement.

Under Florida law (which the parties selected as the law governing this settlement agreement), economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure. *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000).[4] "Establishing a case of economic duress is extremely difficult." *Id.* "The aggrieved party must show: (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." *Id.* (internal citations omitted). "In essence, the party seeking to rescind the contract must show 'that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or free will[.]'" *Id.* (quoting *Finn v. Prudential–Bache Sec., Inc.*, 821 F.2d 581, 587 (11th Cir. 1987)).

In the instant case, the Company has not come anywhere close to establishing that it had no reasonable alternative course of action. It could have defended the lawsuit. It could have demanded removal of the so-called penalty clause. It could have

---

[4] Under Florida law, economic duress is not an independent tort, only a defense or remedy in a contractual context. *NN Iv'rs Life Ins. v. Prof'l Grp., Inc.*, 468 So. 2d 532 (Fla. 3d DCA 1985).

continued to litigate the case and sought summary judgment if the facts were not in dispute. It could have made an offer of judgment for a modest sum in an effort to persuade Plaintiff to settle. The Undersigned is far from convinced that Defendants' duress theory is viable. *See Leader Global Sols., LLC v. Tradeco Infraestructura, S.A. DE C.V.,* 155 F. Supp. 3d 1310, 1317-18 (S.D. Fla. 2016) (applying Florida law).

## Mutual Mistake

Defendants' reformation theory is premised on the mutual mistake doctrine. In Florida, "[a] court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties." *Providence Square Ass'n, Inc. v. Biancardi,* 507 So. 2d 1366, 1369 (Fla. 1987) (internal citations omitted). Given the "strong presumption" that a contract accurately expresses the true intention or agreement of the parties, the party seeking reformation on the basis of a mutual mistake faces a high evidentiary burden. *Ins. Co. of N. Am. v. Ours,* 266 So. 2d 168, 169 (Fla. 4th DCA 1972). That party must show by clear and convincing evidence "that the parties [to the contract] agreed on one thing and when they put it in the contract they said something different." *Blumberg v. Am. Fire & Cas. Co.,* 51 So. 2d 182, 184 (Fla. 1951). "Clear and convincing evidence" is evidence that "produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be

24

established." *S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC*, 139 So. 3d 869, 872 (Fla. 2014) (internal quotation omitted).

Defendants have not shown by clear and convincing evidence the existence of a mutual mistake.  First, as noted in *Essex Insurance Co. v. Tina Marie Entertainment, LLC*, the Eleventh Circuit has recognized that Florida law imposes "stringent standards for reformation." 602 F. App'x. 471, 473-74 (11th Cir. 2015) (quoting *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 8 F.3d 760, 766 (11th Cir. 1993)).

Furthermore, to determine if those standards are met, it is appropriate (as explained in *Essex Insurance*) to compare Florida court cases addressing the availability of reformation based on mutual mistake with the case at hand. 602 F. App'x. at 473. Florida courts have found **mutual mistake** where the party seeking reformation presented evidence, such as the discussion or negotiation of a particular provision in a contract, showing that the contracting parties agreed on one thing before they put their agreement in writing and that their written agreement said something different. *USAA Cas. Ins. Co. v. Threadgill*, 729 So. 2d 476, 478–79 (Fla. 4th DCA 1999) (internal citations omitted).

Defendants have not established these requirements. This case is similar to the scenario in *Essex Insurance*, where the Court rejected the mutual-mistake theory and noted that the party invoking the doctrine "point[ed] to no evidence that it and [the

other party] ever discussed or negotiated the inclusion of the two endorsements at issue before [the challenging party] issued the policy without them." 602 F. App'x at 473. In the instant case, although there was no testimony either way, the fact-based argument presented by defense counsel is that neither side ever spoke about the issue of whether a social security number was required for a W-2 form.

At bottom, the parties were, even under Defendants' version of events, involved in a scenario where the inability to use an ITIN number, instead of a social security number, on a W-2 was "never discussed and never negotiated." *Threadgill*, 729 So. 2d at 479. There was no evidence suggesting that Defendants based their initial position (of demanding that $9,000 of the $10,000 back wages settlement be withheld) on information or advice supplied by Plaintiff.

But there are additional reasons to reject Defendants' mutual mistake theory.

First, Defendants have been somewhat guarded in their factual presentation. They have not identified the two CPAs who supposedly gave them advice last October. In effect, they are relying on an "advice of accountant" theory for their failure to timely pay, but they have not explained what information they provided to the accountants which led to the advice.

Second, it appears as though the CPAs' opinions were oral and relatively informal.  Defendants have not mentioned anything about a written opinion, and they have not suggested that any portions of the opinions were even put in writing.

Third, they failed to comply with this Court's order requiring that those two CPAs appear for the evidentiary hearing (since they were the financial professionals whose advice Defendants were relying upon for their decision to initially delay the final payment and then their follow-up decision to withhold $9,000 from a $10,000 portion of the total settlement). Defendants did not file a motion, asking to be excused from the requirement to have the two CPAs testify, nor did they ask for leave to have their current expert, Mr. Beck, appear at the hearing instead of the two CPAs. Instead, Defendants unilaterally determined that they did not need to bring the CPAs who their counsel supposedly relied upon and then decided on their own to bring Mr. Beck.

Fourth, it appears that the informal advice was incorrect -- most likely because the two CPAs were not advised that Plaintiff met the substantial presence test, which even Defendants' expert agrees would mean that he is a resident for income tax purposes.

Fifth, Defendants' current expert, Mr. Beck, agreed that the letter alternative is a viable strategy. Had Defendants consulted with him last October and advised that Plaintiff met (or likely met) the substantial presence test, then he may well have at that

time offered the suggestion he proffered at the hearing. If that had occurred, then Defendants would not have withheld too much money from the final section of the settlement payment.

Sixth, Defendants waited too long to actually investigate the specifics of how and under what circumstances to make the back pay settlement, to issue a tax form, and to withhold the correct amount.  Given that Defendants were already sensitive enough to the issue to demand an ITIN number, they should have taken steps to learn the specifics, rather than waiting almost three months, taking no action, and then, at the last moment, being confronted with a tax preparer who refused to issue a W-2, and then having to rush around to obtain informal, apparently unwritten, off-the-cuff opinions from two unidentified CPAs who may not have had all the relevant factors presented to them.

Seventh, Defendants waited far too long to obtain an opinion confirming that they could have at least attempted the "letter-to-the-IRS" strategy.  The motion to enforce the settlement agreement was filed in October 2016, but Defendants did not learn of the recommended approach from their expert until late July 2017, when he agreed with Plaintiff's counsel's expert at the evidentiary hearing.

Finally, the term "mistake" does not accurately describe what happened.  The record developed in this case demonstrates that the Company and its counsel simply

*assumed* that a TIN number would be sufficient to use on a W-2 form, but did not actually start to substantively research the issue further until the Company's tax preparer surprisingly raised the issue when she announced a refusal to issue the W-2.

### Impossibility of Performance

It seems as though Defendants have asserted impossibility of performance, albeit somewhat informally, in connection with <u>two</u> arguments: (1) that it was "impossible" to issue a W-2 with only a TIN number and no social security number and (2) that it was "impossible" to deliver a check to Plaintiff's counsel's office during days when it was closed for the Sabbath and the Jewish holidays.

Under the doctrine of impossibility of performance or frustration of purpose, a party is discharged from performing a contractual obligation which is impossible to perform, and the party neither assumed the risk of impossibility nor could have acted to prevent the event, rendering the performance impossible. *Shore Inv. Co. v. Hotel Trinidad, Inc.,* 158 Fla. 682, 683 (1947); *Ferguson v. Ferguson,* 54 So. 3d 553, 556 (Fla. 3d DCA 2011); *Am. Aviation, Inc. v. Aero–Flight Serv., Inc.,* 712 So. 2d 809, 810 (Fla. 4th DCA 1998).

The doctrine of impossibility of performance should be employed with great caution if the relevant business risk was foreseeable at the inception of the agreement and could have been the subject of an express provision in the agreement. *See Home Design Ctr.-Joint Venture v. Cty. Appliances,* 563 So. 2d 767, 769 (Fla. 2d DCA 1990).

Where performance of a contract becomes impossible after it is executed, if knowledge of those facts were available to the promisor prior to that time, he cannot then invoke them as a defense to performance. *Shore Inv. Co. v. Hotel Trinidad,* 158 Fla. 682, 683 (1947). If the risk of the event that has supervened to cause the alleged frustration was foreseeable, then there should have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed. *See City of Miami Beach v. Championship Sports, Inc.,* 200 So. 2d 583, 586 (Fla. 3d DCA 1967).

Concerning the second scenario implicated by Defendants' impossibility of performance argument, the Undersigned concludes that Defendants did not establish this affirmative defense because they recognized the risk associated with a settlement involving an illegal alien and did not completely research the issue and possible alternatives before entering into the settlement agreement. Moreover, the settlement as drafted is not yet "impossible" because, as explained by both experts, the "letter to the IRS" approach may well be effective. *See, generally, Am. Aviation*, 712 So. 2d at 810 (reversing judgment because appellate court concluded that engine overhauler's failure to perform contract was not excused by the impossibility of performance doctrine because the manufacturer's "blacklisting" of the engine, which made the required certification impossible, was foreseeable to the engine overhauler at the time of contracting); *see also Zephyr Haven Health & Rehab. Ctr., Inc. v. Hardin,* 122 So. 3d 916, 920

(Fla. 2d DCA 2013) (rejecting impossibility of performance argument and noting that doctrine cannot be invoked "if knowledge of the facts making performance impossible was available at the inception of the agreement") (internal quotation omitted); *Spring Lake NC, LLC v. Figueroa*, 104 So. 3d 1211, 1216 (Fla. 2d DCA 2012) (reversing order denying motion to compel arbitration where the trial court erroneously relied on the impossibility doctrine, because "the purpose for which the agreement was drafted – arbitration – was not rendered impossible" given other available alternatives).

Focusing on the closure of counsel's office, the circumstances surrounding the payment deadline are somewhat ambiguous and unclear.  The settlement agreement requires the Company to make the payments within five days of the conditions precedent being satisfied by Plaintiff and his counsel.  The motion to enforce the settlement agreement explained that Judge Lenard approved the settlement agreement in an October 18, 2016 Order and that Plaintiff had met all conditions precedent for payment. It did not, however, pinpoint *when* Plaintiff fulfilled those conditions precedent.

Nevertheless, it seems that the conditions were met at least five days before October 21, 2016, because that is when the Company furnished checks for some of the settlement proceeds. In a November 3, 2016 reply, Plaintiff represents that his counsel forwarded the necessary conditions precedent documents to defense counsel **on August**

**22, 2016**. [ECF No. 105, p. 3]. However, the exhibit filed to support that representation was not actually the correct exhibit.[5] On the other hand, Defendants have never disputed that the documents confirming the fulfillment of the conditions precedent were in fact forwarded on August 22, 2016. Therefore, the Undersigned will use August 22, 2016 as the date that Plaintiff met the conditions precedent.

Nevertheless, the settlement agreement does not say how long the Company has to make the payment **following the Court's approval** of the settlement agreement as "fair" under *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982). Thus, if the conditions precedent had been met by mid-August 2016, and Judge Lenard entered her order on October 18, 2016 at 1:38 p.m., which she did, then the Company's payment obligation arguably arose on October 18, 2016 at 1:39 p.m. That interpretation might seem odd and unduly aggressive, but that could conceivably be a permissible construction of the settlement agreement, which left open the specific payment deadline after Court approval of the settlement agreement.

In retrospect, it is clear that the parties contemplated that a court order approving the settlement would be entered first and then Plaintiff would meet the

---

[5]    The exhibit is a two-page excerpt from a deposition taken of Mirelys Llerena, the wife of Eddy Coto. She works as a manager at the Company. The excerpt has absolutely nothing to do with when the conditions precedent documents were forwarded or whether they were sent in August 2016.

conditions precedent.  Under that hypothetical scenario, the payment would be due five days after the conditions precedent were met.  But the settlement agreement does not discuss what happens if the timing were to be reversed (with the court approval following the satisfaction of the conditions precedent).

In any event, regardless of the settlement agreement's failure to address the practical issue of when after Court approval the payments were due (assuming full, earlier performance of the conditions precedent), it seems that Plaintiff's counsel took the position that all settlement payments were due **immediately**[6] and that Defendants understood that the payments were due very soon -- i.e., at the very least, by Friday, October 21, 2016 (because some checks were delivered then). In fact, in their response, Defendants explained that their counsel notified them of their obligation to prepare settlement checks the very day that the District Court entered its October 18, 2016 Order approving in large part the Undersigned's Report and Recommendations. [ECF No. 103, p. 1].

The Undersigned does not take issue with Defendant's impossibility of performance theory concerning the days that Plaintiffs' office was closed.  But that

---

[6]     On October 21, 2016 at 3:24 p.m. [ECF No. 103-1, p. 9], one of Plaintiff's attorneys sent an email to defense counsel entitled "Notice of breach," advising that $20,000 of the $30,000 should be without deductions. The exhibit submitted with the defense response is cut off and does not contain the remainder of the email.

theory would not excuse the failure to send the final check (for $10,000, minus the appropriate deductions of between $1,000 to $1,500) *before* the office closed. Had they conducted a more-thorough inquiry back in October, Defendants would have been able to issue the third check along with the other two checks on October 21, 2016.

Based on this analysis, the Undersigned finds that Defendants breached the Settlement Agreement by failing to timely pay the full amount of the settlement proceeds. In reaching this conclusion, the Undersigned is **not** concluding that Defendants acted in bad faith. Likewise, I recognize that Defendants made some effort to look into the tax issue which arose in late October 2016 (because of the incorrect assumption that an ITIN number could have been used and the incorrect assumption that Plaintiff is an illegal alien and could not take advantage of the substantial presence theory for resident classification). But Plaintiff does not need to show bad faith to obtain an order enforcing the settlement agreement based on a breach.

Therefore, the Undersigned respectfully recommends that the District Court order Defendant Company to pay the unpaid back wages portion (less the appropriate withholdings for a resident) within three days, pay interest on the unpaid amount (from October 21, 2016 to the date payment is made), and pay attorney's fees and costs. Because the Undersigned has no confidence that the parties will be able to agree upon the appropriate amount of attorney's fees and costs (including fees and costs incurred

in connection with the dual-purpose hearing),[7] the Undersigned also recommends that Plaintiff's counsel submit the billing and costs records and an appropriate affidavit outlining the specific amounts of fees and costs which are being sought.

### The $10,000 "Penalty"

The Undersigned is not convinced by Plaintiff's argument that Defendants have waived the unenforceable-penalty argument by submitting the settlement agreement to the Court (both the Undersigned and Judge Lenard) for a fairness hearing and a ruling on the objections.

First, the parties did not initially file the actual settlement agreement with the Court when it evaluated the agreement for fairness. Instead, the District Court permitted the parties to explain the significant terms to the Undersigned in a fairness hearing. [ECF No. 83]. That fairness hearing occurred on June 22, 2016.

Review of the digital audio recording of that telephone fairness hearing reveals that the parties **never** mentioned the $10,000 penalty provision in the comments they made on the record to me about the settlement agreement.  Initially, defense counsel

---

[7]     The two law firms involved in this case have several lawsuits against each other in this district.  A few of them are before the Undersigned.  **All of those cases are difficult,** with counsel (1) making personal attacks against opposing counsel; (2) filing sanctions motions; (3) disagreeing about the scheduling of discovery hearings; (4) telephoning chambers with so-called emergency issues; (5) exchanging nasty emails; and (6) litigating a motion to disqualify defense counsel.

35

summarized the settlement agreement.  She mentioned the $1,000 damages provision for breach of a confidentiality provision and listed the other major provisions of the settlement -- except for the $10,000 penalty provision.  The Undersigned then asked Plaintiff's counsel if he had anything to add to the summary of the settlement agreement. He offered one additional point, but it did not concern the $10,000 penalty. Therefore, this issue was never discussed at the fairness hearing and the Undersigned never even had the opportunity to determine if it was "fair."

Second, even if the $10,000 penalty had been disclosed during the fairness hearing (which it was not), it is debatable whether an FLSA fairness hearing is designed to evaluate the fairness of a settlement to only the plaintiff or to both the plaintiff *and* the defendant.  There is some authority suggesting that the fairness evaluation focuses only on the plaintiff. *See, e.g., Lytle v. King's Constr. Co.*, No. 14-cv-288, 2015 WL 12856450, at *5 (N.D. Ga. July 30, 2015) (noting that "the purpose of requiring judicial scrutiny over FLSA settlements is to protect unrepresented employees from the inherent bargaining advantage their employers have holding onto owed wages" and opining that "[t]here is no indication that there was any intention to protect an *employer*, particularly one represented by counsel, from having an agreed settlement enforced.") (emphasis added).

Third, regardless of whether the fairness hearing is designed to also address the fairness to the defendant employer, the Undersigned did not in this case undertake that analysis.  Instead, I looked only at the fairness to the *Plaintiff* when I evaluated the terms the parties told me about during the hearing. And, as noted, the $10,000 penalty was never disclosed to me anyway, so it would not have been part of the fairness analysis.

Fourth, the written settlement agreement had not been filed as a matter of record when I held the fairness hearing or when Judge Lenard reviewed the parties' objections to my Report and Recommendations on the fairness of the settlement agreement and the propriety of the attorney's fees and costs requested by Plaintiff. In fact, the settlement agreement was not filed until December 14, 2016 [ECF No. 107], the same day as Judge Lenard's Order directing the parties to file it. [ECF No. 106]. The Order adopting and modifying the "fairness hearing" Report and Recommendations was entered on October 18, 2016, however. [ECF No. 97]. Even if Judge Lenard had listened to the digital audio recording of the telephone fairness hearing before entering her ruling, she would not have learned about the $10,000 penalty provision. So, not surprisingly, Judge Lenard's Order did not discuss the issue of whether the $10,000 payment is an unenforceable penalty or a permissible liquidated damages clause.

Thus, the issue of whether the page-eight language is an unenforceable penalty or a valid, negotiated and enforceable term of the settlement agreement is properly

before me and it has not been waived by a joint request for judicial assessment of the settlement agreement's fairness.

Defendants cite, among other authorities, *Air Caledonie Int'l. v. AAR Parts Trading Inc.*, No. 02-21193, 2003 U.S. Dist. LEXIS 15907, at * 29 (S.D. Fla. Aug. 12, 2003), for their argument that the $10,000 payment for a breach is an unenforceable penalty. In that case, the liquidated damages provision deemed unenforceable calls for damages of $100,000 per day until an engine was redelivered in the condition required by the lease. *Id.* The daily rent specified in the lease was only $3,300 per day, a scenario which the Court there described as being "an amount 29 times higher than the Daily Rent," which means it is "nothing more than a penalty, and thus, is unenforceable." *Id.* In comparison, the $10,000 penalty being sought here is for a failure to pay a $10,000 portion of the settlement, and Plaintiff demanded his payment within a few days of the obligation arising (following the District Court's ruling approving, in large part, the Report and Recommendations on the settlement agreement).

To be sure, defense counsel is the one who drafted the settlement agreement here. As a general rule, any doubts about a contract's interpretation or effect must be resolved against the draftsman, which is the Company. *Finberg v. Herald Fire Ins. Co.*, 455 So. 2d 462, 463 (Fla. 3d DCA 1984). On the other hand, where a clause has been inserted for the benefit of a party, that clause is to be construed more strongly against

that party -- a rule which would mean that the clause would be construed against

Plaintiff. *Home Savings of Am., F.A. v. Roehner*, 491 So. 2d 612, 613 (Fla. 4th DCA 1986).

The Florida Supreme Court outlined the controlling legal rules governing the

penalty issue in *Lefemine v. Baron*, 573 So. 2d 326, 328 (Fla. 1991), when it noted that:

> It is well settled that in Florida the parties to a contract may stipulate in
> advance to an amount to be paid or retained as liquidated damages in the
> event of a breach. *Poinsettia Dairy Prods. v. Wessel Co.,* 123 Fla. 120, 166 So.
> 306 (1936); *Southern Menhaden Co. v. How,* 71 Fla. 128, 70 So. 1000 (1916). In
> *Hyman v. Cohen,* 73 So.2d 393 (Fla.1954), this Court established the test as
> to when a liquidated damages provision will be upheld and not stricken
> as a penalty clause. First, the damages consequent upon a breach must not
> be readily ascertainable. Second, the sum stipulated to be forfeited must
> not be so grossly disproportionate to any damages that might reasonably
> be expected to follow from a breach as to show that the parties could have
> intended only to induce full performance, rather than to liquidate their
> damages.

*Id.*

The *Lefemine* Court held that the default provision in a real estate contract was

not enforceable as a liquidated damages clause because it was an unenforceable penalty

-- because an option to sue for actual damages negated the intent to liquidate damages.

*Id.* at 330. The Court there explained that neither party actually intended the stipulated

sum to be the agreed-upon measure of damages, which means it could not be a valid

liquidated damages clause. The contract gave the seller the option to choose liquidated

damages or to sue for actual damages, a scenario the Court explained was indicative of

an intent "to penalize the defaulting buyer and negates the intent to liquidate damages in the event of a breach." *Id.* at 329.

Plaintiff urges the Undersigned to find *Lefemine* inapplicable, a result reached by a state appellate court in *Boswell v. Zegeye*, 954 So. 2d 66 (Fla. 4th DCA 2007). In *Boswell*, the Court found *Lefemine* inapplicable for several reasons. First, it explained that the policy concerns underlying *Lefemine* -- disallowing penalty provisions for breach of a real estate contract -- were inapplicable to a new agreement entered into to resolve a dispute after a breach had occurred. *Id.* at 68. That distinguishing factor is not present here, where there was no prior agreement before the parties entered into a settlement agreement containing the clause at issue. Second, the Fourth District Court of Appeal noted that the *Lefemine* contract did not include the rental of the subject property pending the closing. *Id.* This distinguishing factor is also not present here. The instant FLSA case is, obviously, not a contract for the purchase and sale of real estate and does not include provisions for rental of property.

The third and final reason which *Boswell* relied upon was that the default provision simply provided alternative remedies for the buyer's breach of the rental and maintenance/utility fee provisions. *Id.* The settlement agreement here authorizes Plaintiff to recover a $10,000 penalty and to seek enforcement of the agreement (with entitlement to attorney's fees and costs).

The first clue to suggest that the clause at issue is an unenforceable penalty, as opposed to an enforceable liquidated damages clause, is the simple fact that the provision itself describes the consequences "as a penalty." Thus, the actual language undermines Plaintiff's position that the provision is not a penalty.

The next clue is that the amount is, or could be, grossly disproportional to the amount of actual damages incurred as a result of the breach.  As drafted, the provision would entitle Plaintiff to $10,000 "as a penalty" if Defendants submitted a $10,000 payment one day late. Using a 1% annual interest factor, Plaintiff would incur $100 in damages per year. If the payment were one week late, then the actual damages (excluding attorney's fees and costs if a motion to enforce had to be filed) would be a mere $1.93. Therefore, a $10,000 penalty is surely a grossly disproportional amount. The disproportionality would be huge.

The next clue is that the damages flowing from a non-payment breach are, in fact, ascertainable. This is significantly different than a real estate contract scenario, where a seller may well encounter difficulty demonstrating the damages he sustained as a result of keeping the property off the market during the time that the buyer had the property under contract before defaulting.

For these reasons, the Undersigned recommends that the District Court find the

$10,000 "penalty" provision to be an unenforceable penalty.[8] *Lefemine,* 573 So. 2d at 320;

*MCA Television Ltd. v. Public Interest Corp.,* 171 F.3d 1265, 1281 (11th Cir. 1999) (applying

Florida law to invalidate a default damages provision concerning a license for

syndicated television programming); *Coleman v. B.R. Chamberlain & Sons, Inc.,* 766 So. 2d

427, 429 (Fla. 5th DCA 2000) (explaining that "penalty provisions disguised as

liquidated damages provisions have long been found to be unenforceable in Florida.")

(internal citation omitted); s*ee also Axiom Worldwide, Inc. v. HTRD Group Hong Kong Ltd.,*

No. 8:11-CV-1468-T-33TBM, 2013 WL 3975675, at *14 (M.D. Fla. July 31, 2013) (finding

that second prong of the *Lefemine* test had not been met because the amount of the

liquidated damages called for by the confidentiality agreement, $5,000, is "grossly

disproportionate to any actual damages that [the non-breaching party] could have

reasonably incurred as a result of the breach").

## Conclusion

The Undersigned respectfully recommends that the District Court **grant**

Plaintiff's motion for attorney's fees; require payment of the remaining $10,000 (less

---

[8]     Although the issue of whether a contract provision is an unenforceable penalty
or a valid liquidated damages clause often arises in real estate contract litigation, that is
not always the case. *Air Caledonie,* for example, does not involve a real estate contract.
U.S. Dist. LEXIS 15907, at * 29.

applicable withholdings) plus lost interest (as damages arising from the breach) from October 21, 2016 through the date of payment; award costs and attorney's fees; but **reject** the request for the $10,000 "penalty" as an unenforceable penalty. The Undersigned further recommends that Judge Lenard require Plaintiff's counsel to submit copies of the billing and expense records supporting the fees and costs request within 3 days of entry of the Order granting the motion to enforce the settlement agreement.

**<u>OBJECTIONS</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the Parties have **10** days after being served with a copy of this Report and Recommendations to serve and file written objections, if any, with the District Court. Each Party may file a response to the other Party's objection within **10** days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1);

*Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

 **RESPECTFULLY RECOMMENDED,** in Chambers at Miami, Florida, July 31, 2017.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
Honorable Joan A. Lenard
All counsel of record